

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-17-00193-CR

———————————————————

HOWARD WAYNE BAKER, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1497784R

Per Curiam Memorandum Opinion

# MEMORANDUM OPINION

After hearing evidence about a December 2014 bar fight between rival motorcycle gangs in Fort Worth that left one man dead and at least three others injured, a jury convicted Appellant Howard Wayne Baker of seven offenses: (1) three counts concerning the death of Texas Ghost Rider Geoffrey Brady—directing the activities of a criminal street gang, engaging in organized criminal activity, and murder; (2) two counts concerning the aggravated assault of Wino's Crew member David Antes—directing the activities of a criminal street gang and engaging in organized criminal activity; and (3) one count each of engaging in organized criminal activity concerning the aggravated assaults of fellow Bandidos Bill Dudley and Michael Anderson. But the jury acquitted Baker of one count of possession of a firearm by a felon. The trial court then sentenced Baker to forty-five years' confinement for the two counts of directing the activities of a criminal street gang, forty years' confinement for the four counts of engaging in organized criminal activity, and forty years' confinement for murder, ordering all the sentences to run concurrently.

In ten points, Baker challenges the sufficiency of the evidence to support all seven convictions (Points One through Seven), contends that his multiple convictions regarding Brady's death and the aggravated assault of Antes violate the Double Jeopardy Clause (Points Eight and Nine), and complains that the trial court abused its discretion by admitting other gang members' extraneous offenses into evidence against him (Point Ten). We affirm the trial court's judgments.

**STATEMENT OF FACTS**

In December 2014, tensions were flaring among the Bandidos, a worldwide outlaw motorcycle gang, and other motorcycle clubs and gangs in the Fort Worth area because no motorcycle club or gang was allowed to wear a Texas patch as the "bottom rocker"—the patch at the bottom of their vests (also known as cuts)—without the Bandidos' permission, but some groups did so anyway. Against this backdrop, on December 12, 2014, the Bandidos stormed a bar en masse, resulting in several injuries and one death. Because the fighting took place both inside and outside the bar, the State's evidence of the night's events had to be pieced together from the differing perspectives of several witnesses.

The night of December 12, two young women planned to go to Gator's Bar on Race Street in Fort Worth. They parked and walked toward the bar when several Bandidos arrived, parked across the street, and began entering the bar.[1] One of the Bandidos told the two young women not to go inside. The women "stepped back on the sidewalk," heard a gunshot within seconds, ducked, heard more gunshots "a few seconds later," and saw people running away from the bar. The women then left, and one of them called 911, stating that she had seen approximately twenty Bandidos.

Micah Baker, who was not related to appellant Howard Baker but who had dated him in the past, was inside the bar with friends from the Bandidos' rival

---

[1] The bartender on duty saw a large group of people rush into Gator's from both the front and back doors.

motorcycle gangs, the Ghost Riders and Wino's Crew. She also saw a Cossack inside the bar but did not know him. Micah heard and saw motorcycles drive up and park across the street. She knew the men riding them were Bandidos because she recognized their red and gold vests. Micah saw the men enter from all three bar entrances. She recognized Robert Stover when he came through the front door but not the man behind Stover, who was wearing a helmet.[2] Micah saw Stover stop, turn around and look, and then head straight for Antes, a Wino's Crew member. Sheryl Miscavage, Antes's girlfriend at the time of the incident but his wife by the time of trial, testified that Antes's Wino's Crew patch was facing the front door when Stover came in. Stover passed by Miscavage as he walked over to Antes; when he approached Antes, he "kind of smiled whenever [Antes] looked up at him . . . and knocked the crap out of him." Similarly, Micah testified that Stover hit Antes "very hard" and "knocked him out."

Megan Cline Smith, the wife of Wade Smith, a Ghost Rider whom the Bandidos beat up that night outside Gator's, testified that Stover hit Antes with either a sock with a lock in it or a Maglite flashlight. Antes did not know who hit him or what that person hit him with.

Chaos ensued when Stover hit Antes, and more fighting took place toward the front of the bar. Then Micah heard multiple gunshots, after which the fighting moved

---

[2]Another witness testified that "a lot of" the Bandidos who entered the bar "still had their helmets on."

outside. She later saw Antes in the bathroom, "bloody and looking in the mirror." He had a swollen eye with a golf-ball-sized knot on his cheek, which was split. His "face was pretty messed up for" a few weeks.

A member of a band that regularly played at Gator's was having a beer with one of his bandmates after their set when they "heard a couple of bikes roll in kind of silently." His bandmate looked out the window, said "red and gold," and got up to leave. As they were leaving, the band member saw "approximately 20-something guys or more" coming in. He also saw Baker, wearing his cut and colors and "everyone else [coming] in behind him." It was clear to the band member that there was going to be a fight because the men entering the bar were hitting their palms with flashlights, clubs, and whatever was in their hands. Baker and several of the men carried clubs, and another person in the group carried a drawn pistol.

After leaving the bar, the band member stood off to the side of the front porch. As soon as he stepped out, he heard two gunshots from inside the bar. Then he saw the fight move outside, and a crowd pushed Brady outside. After the crowd stumbled over three motorcycles, according to the band member, the Bandidos "had [Brady] on the ground," facedown at first. "They [were] all pretty much standing right over the top of him." Baker stood at the back of the group, and Stover was also in the group. The band member then saw flashes and gunfire from the group surrounding Brady and saw the group run away.

Cline Smith had a different perspective. After Stover hit Antes, Cline Smith saw her husband and Brady push all of the people who had run into Gator's back outside, and then she saw Stover point a gun at Brady's head and pull the gun up. Cline Smith went out the side door to check on her husband. By the time she got outside, she saw Brady lying on the ground with a group of Bandidos kicking him in the head and punching him. She saw Baker in that group, not hitting or kicking Brady but standing by him with a gun. Brady was bleeding.

The Bandidos fled, and a Ghost Rider shot at them. After they were gone, Cline Smith saw that Brady was dying. The police arrived at Gator's a short time later, about six minutes after the Bandidos had first arrived at Gator's.

Brady died at the scene. His autopsy revealed three gunshot wounds from two guns with different calibers; two of the wounds were "individually fatal."

After Harris Hospital alerted the Fort Worth Police Department (FWPD) that gunshot victims had arrived in the emergency room, a Fort Worth police detective assisting with the case interviewed Bandidos Joshua Horton and Joseph Karadeema and Rebel Rider[3] Stephen Martin, who had gone to the hospital by car. A FWPD officer stopped a motorcycle rider headed away from Gator's, Rebel Rider William Connor, who wore the Bandidos colors. Connor had three guns and ammunition. Police eventually traced one of those guns to Karadeema. The police also photographed the injuries and collected the clothing of two other Bandidos—

---

[3]The Rebel Riders were a support club of the Bandidos.

Anderson and Dudley—who had been shot at Gator's and had gone to the emergency room. A spent bullet was recovered from Anderson's back pants pocket.

The police conducted an extensive investigation, including seizing and examining Baker's cell phone and cell phones found on two other Bandidos. The cell phone evidence generally confirms coordination between the Bandidos and Rebel Riders, the intent to retaliate against a person "wearing it," and concern for individual Bandidos' and Rebel Riders' safety after the event.

Police found bullets and casings at Gator's as well as at businesses across the street, which also had shot out windows and doors. A FWPD forensic division manager of the crime lab testified at Baker's trial that at least ten different firearms were involved in this case, but no bullets or casings collected throughout the investigation matched any recovered gun.

## DISCUSSION

### I. Sufficiency of the Evidence

In his first seven points, Baker challenges the sufficiency of the evidence supporting his seven convictions. He does not contend that the murder or aggravated assaults did not occur. Instead, he contends that the State convicted him based merely on his presence at the scene and his membership in the Bandidos—"a dangerous precedent." According to Baker, the eight eyewitnesses did not testify that he personally committed any act against Brady, and the evidence collected by law

7

enforcement as part of their investigation was no evidence. We discuss Baker's sufficiency points by offense rather than in the order assigned by Baker's briefing.

## A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency

8

review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if

9

it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Although motive and opportunity are not elements of a criminal offense, they can be circumstances that indicate guilt; therefore, we may properly consider them in an evidentiary-sufficiency review. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

"[I]f a defendant is acquitted of one count and convicted of another based on the same evidence in a single trial, the defendant cannot rely on the inconsistent verdicts to attack [his] conviction." *Hernandez v. State*, 556 S.W.3d 308, 331 (Tex. Crim. App. 2017) (Richardson, J., concurring); *see also United States v. Powell*, 469 U.S. 57, 68–69, 105 S. Ct. 471, 478–79 (1984); *Dunn v. United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 190 (1932), *overruled on other grounds by Sealfon v. United States*, 332 U.S. 575, 68 S. Ct. 237 (1948); *Silva v. State*, No. 02-18-00155-CR, 2018 WL 2986901, at *3 (Tex. App.—Fort Worth June 14, 2018, pet. ref'd) (per curiam) (mem. op., not designated for publication). Thus, Baker's acquittal of the illegal possession of a firearm count has no bearing on our sufficiency analysis of the other offenses.

### B. Brady's Murder

In his seventh point, Baker challenges the sufficiency of the evidence supporting his conviction for murdering Brady.

The indictment tracked the elements of murder in the Texas Penal Code, alleging in Count Nine that Baker committed murder by either (1) intentionally or knowingly causing Brady's death by shooting him with a firearm or (2) with the intent to cause Brady serious bodily injury, committing an act clearly dangerous to human life—shooting Brady with a firearm, causing his death. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2).

The jury charge tracked the indictment and also included an instruction on the law of parties. *See In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) (orig. proceeding) (holding that the State is entitled to an instruction on the law of parties if it legally applies to the offense at issue and if it is supported by the evidence); *see also Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005) (op. on reh'g) ("It is well settled . . . that the law of parties need not be pled in the indictment."). Under the law of parties, Baker did not have to physically attack Brady to be held criminally responsible for his murder. A person is criminally responsible for another's conduct when "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code Ann. § 7.02(a)(2). Further,

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

11

*Id.* § 7.02(b).

Applying the law of parties, the evidence is sufficient to support a finding that Baker encouraged and aided the other Bandidos in murdering Brady.

Baker was one of the Bandidos who stormed the bar; Stover was another. Cline Smith saw Stover and Brady standing side by side in the bar's front entryway. She saw Stover pointing a gun at Brady's head and then pulling the gun back. Soon thereafter, she saw a group of people kicking Brady in the head and hitting him. He was then lying on the ground. She saw Baker holding a gun and standing by Brady.

The band member testified that the crowd who had stormed the bar—which evidence shows included Baker—pushed Brady outside Gator's and had him on the ground the whole time. The band member saw two sets of flashes and gunfire from the group made up of "mostly all Bandidos" surrounding Brady. Baker was in the group, standing at the back, as well as Stover and the Bandidos' sergeant-at-arms Nicholas Povendo; evidence indicated that all three had guns.

Brady suffered three gunshot wounds before his death. One bullet went through his face and pierced his jugular vein, and another perforated both lungs and the brachialis vein; both of these wounds were fatal. Although there was no evidence about who fired the fatal shots, the evidence is more than sufficient to show that Brady was murdered in a concerted group effort and that Baker was an active participant in that group, helping to storm the bar and to contain Brady within the crowd (and thus allowing members of the crowd to beat and shoot him). Applying the

12

appropriate standard of review, we hold that the evidence is sufficient to support Baker's murder conviction as a party. *See id.* § 7.02(a)(2); *Rodriguez v. State*, No. 08-16-00118-CR, 2018 WL 3372637, at *9 (Tex. App.—El Paso July 11, 2018, pet. ref'd) (mem. op., not designated for publication) (involving gang murder with similar appellate complaint and analysis). We overrule his seventh point.

## C. Engaging in Organized Criminal Activity—Brady's Murder and Aggravated Assaults of Antes, Anderson, and Dudley

In his first four points, Baker challenges his four convictions for engaging in organized criminal activity.

In Count Four, the indictment charged that Baker, "with the intent to establish, maintain[,] or participate as a member of a criminal street gang, commit[ted] . . . murder" by intentionally or knowingly causing Brady's death by shooting him with a firearm or by intending to cause him serious bodily injury and shooting him with a firearm. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2). In Count Six, the indictment charged that Baker, "with the intent to establish, maintain, or participate as a member of a criminal street gang[,] commit[ted] the offense of aggravated assault . . . [of] Antes" by intentionally or knowingly causing bodily injury to him by striking him with a deadly weapon, either a fist, flashlight, or unknown object. *See id.* §§ 22.01(a)(1), 22.02(a)(2). Counts Seven and Eight alleged that Baker, "with the intent to establish, maintain, or participate as a member of a criminal street gang[,] commit[ted] the offense of aggravated assault" of Dudley and Anderson by

intentionally or knowingly causing bodily injury to them by shooting them with a firearm. *See id.*

The jury charge, which is not challenged on appeal, tracked the indictment. The charge also instructed the jury to find Baker guilty of engaging in organized criminal activity if it found beyond a reasonable doubt that he committed the underlying offenses, either alone or as a party. Although the law of parties applies to the offense of engaging in organized criminal activity, "the elements of engaging in organized criminal activity render the State's reliance on the doctrine unnecessary. . . . [A]cts that suffice for party liability—those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense—would also satisfy" Section 71.02's overt-act element. *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003).

Section 71.02 of the Texas Penal Code provides that a person engages in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit" a specified predicate offense, here murder and aggravated assault. Tex. Penal Code Ann. § 71.02(a)(1). As the Texas Court of Criminal Appeals clarified after the underlying trial and after Baker's brief was filed, the "intent to establish, maintain, or participate" element does not apply when a defendant is charged "as a member of a criminal street gang" but instead "applies only to the phrase that immediately follows it—'in a combination or in the profits of a combination.'" *Zuniga v. State*, 551 S.W.3d 729, 735 (Tex. Crim. App.

14

2018); *see also Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Here, Baker was not indicted or charged with the "combination" requirement.

A hypothetically correct jury charge would therefore require the State to prove that Baker, as a member of a criminal street gang, committed Brady's murder and the aggravated assaults of Antes, Dudley, and Anderson either as a principal or a party.[4] *See Zuniga*, 551 S.W.3d at 735; *Villa*, 514 S.W.3d at 232; *Jenkins*, 493 S.W.3d at 599; *see also Garcia v. State*, 578 S.W.3d 106, 124 (Tex. App.—Beaumont 2019, pet. ref'd) (concluding that law of parties was included in hypothetically correct jury charge for sufficiency review and citing *Adames v. State*, 353 S.W.3d 854, 862–63 (Tex. Crim. App. 2011)).

### 1. Criminal Street Gang

To prove that Baker was acting "as a member of a criminal street gang," the State was required to prove that he "was acting as a member of a group of 'three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities.'" *Zuniga*, 551 S.W.3d at 735 (quoting Tex. Penal Code Ann. § 71.01(d)). The hypothetically correct jury charge would therefore also require proof that Baker "was

---

[4]Even if the State had been required to prove the extra "intent to establish, maintain, or participate" element alleged in the indictment and jury charge, which we do not hold, the evidence detailed sufficiently proves that Baker intended to participate as a member of a criminal street gang when committing or conspiring to commit the aggravated assaults.

acting in the role, capacity, or function of a gang member at the time of the offense[s]." *Id.* at 736 (internal quotation marks omitted). The jury heard evidence that

- The Bandidos are a worldwide outlaw motorcycle gang (OMG) that is also a criminal street gang.

- OMGs are "one-percenter[s]. They consider themselves the one percent of society who doesn't follow our rules or our laws."

- OMGs "are involved in repetitive and common crimes ranging from assaults to murders and everything in between. They're commonly involved in narcotics [and] weapons trafficking."

- In 2013, 72% of the Bandidos in the United States had convictions.

- The Bandidos are the dominant OMG in Texas.

- The Bandidos control Texas, and no other motorcycle club can operate in Texas without their approval.

- The Bandidos have a "very strict chain of command."

- Their leadership structure, hierarchy, and chain of command exists nationally and locally; each chapter has the same structure.

- Each chapter must have a president, vice president, secretary, treasurer, and sergeant-at-arms.

- Each chapter has at least five members.

- Bandidos follow bylaws and local chapter rules.

- A Bandidos' president's "authority is total. Nothing goes on without the president's approval."

- The presence of a Bandidos' president at a violent event perpetrated by the gang members is significant because it shows "he knows [the act of violence is] going to happen" and signals that "[h]e's given his okay for that to happen."

16

- The Bandidos' president of a particular region is the "shot caller"; if he is present when an act of retaliation happens in his territory, he is "calling the shots."

- An incident involving multiple support clubs and Bandidos would have been approved by the Bandidos' president.

- Baker was the Fort Worth Bandidos chapter president at the time of the Gator's incident.

- Support clubs pay money to the Bandidos.

- Support clubs wear the same colors as the Bandidos but reversed and also wear "support cookie[s]," patches that indicate that they pay homage to the Bandidos.

- Bandidos' support clubs do much of the criminal work of the Bandidos.

- Rebel Riders are a support club of the Bandidos.

- The Bandidos' colors are red and gold.

- The Bandidos' symbol is a group of three patches. The top patch is the gang's name. The middle patch is a character they call the "Fat Mexican." The bottom patch or "rocker" "shows where they're from and the state that they are claiming territory in."

- The bottom rocker is "where they're saying that this is our state."

- "[Y]ou won't have tattoos that say Bandidos[ or a] red and gold one-percent diamond unless you are a member of the Bandidos."

- Baker wears a patch that says, "God forgives, Bandidos don't."

- Baker has a red and gold, diamond-shaped tattoo with a 1% in the middle of it.

- Baker's vest (cut) and tattoos show that he is a member of the Bandidos.

- The Texas rocker is important because the Bandidos have been the dominant motorcycle gang in Texas since they began.

- Bandidos want money and support in exchange for allowing other gangs to wear the Texas rocker.

- In 2014, the Cossacks also wanted to wear the Texas bottom rocker.

- Miscavage, Antes's wife, knew in November 2014 that the Bandidos were upset that the Wino's Crew gang put a Texas bottom rocker on their patch.

- When Antes was a Wino's Crew member,[5] there was tension between the Bandidos and Wino's Crew motorcycle gangs because of the Wino's Crew Texas bottom rocker; it was "a territory thing" and "an issue of permission" because only Bandidos were allowed to wear the Texas rocker.

- Micah had heard before the Gator's incident that the Bandidos were upset that Cossacks and Wino's Crew gangs put a Texas rocker on their vests.

- According to Cline Smith, the Bandidos and Bandidos support clubs do not get along with Ghost Riders, probably because Ghost Riders wear a Texas bottom rocker.

- A Cossack, two Wino's Crew gang members, including Antes, and four Ghost Riders, including Brady, were in Gator's on the night of the murder and aggravated assaults.

- Bandidos participating with Baker in the Gator's incident included Povendo, the sergeant-at-arms; Stover; Anderson; and Dudley.

Applying the appropriate standard of review, we hold that the evidence is sufficient to satisfy the element that Baker was acting as a member of a criminal street gang during the Gator's incident. *See id.* at 738–39.

## 2. Predicate Offenses

### a. Brady's Murder

In his first point, Baker challenges the sufficiency of the evidence to prove that he participated in Brady's murder. We have already held the evidence sufficient to

---

[5]Antes testified at trial that he was no longer a member of Wino's Crew.

support both Baker's murder conviction and his membership in a criminal street gang. We therefore hold the evidence sufficient to support his conviction for engaging in organized criminal activity by committing Brady's murder as a member of a criminal street gang. *See* Tex. Penal Code Ann. § 71.02(a)(1). We overrule Baker's first point.

### b. Aggravated Assault of Antes

In his second point, Baker contends that the evidence is insufficient to support his conviction for engaging in organized criminal activity regarding the aggravated assaults of Antes. As with Brady's murder, Baker was charged individually and as a party.

The evidence shows that several Bandidos, many of whom carried clubs and at least one of whom exhibited a gun, entered as a group through Gator's front door. Baker and Stover were at the front of the group, together. Stover looked around and saw Antes's Wino's Crew patch on the back of his vest, which was visible to those at the front door. Stover smiled, walked over, and "knocked the crap out of" Antes with either a sock with a lock in it or a Maglite flashlight. Antes bled, his eye swelled, his cheek was split, and his cheek had a big knot on it. Stover was seen with a gun shortly thereafter. That the Bandidos entered the bar ready to fight and that chaos ensued after Stover hit Antes supports a reasonable inference that Stover's assaulting Antes facilitated the larger-scale fighting and ambush of Brady.

We have already held the evidence sufficient to support the "criminal street gang" element. We therefore also hold the evidence sufficient to support Baker's

conviction for engaging in organized criminal activity as a criminal street gang member by committing aggravated assault against Antes. *See id.* We overrule Baker's second point.

### c. Aggravated Assaults of Dudley and Anderson

In his third and fourth points, respectively, Baker contends that the evidence is insufficient to support his convictions for engaging in organized criminal activity regarding the aggravated assaults of Dudley and Anderson.

We agree with Baker that none of the witnesses present during the Gator's incident testified that he personally injured his fellow Bandidos. However, a defendant may be legally responsible for an act that he does not solely cause. Section 6.04 of the Texas Penal Code provides,

> (a) A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.
>
> (b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:
>
>   (1) a different offense was committed; or
>
>   (2) a different person or property was injured, harmed, or otherwise affected.

*Id.* § 6.04.

In *Dowden v. State*, the Texas Court of Criminal Appeals held that Dowden's conduct showed that he was aware that initiating a shoot-out at a police station would

20

result in an officer's death; therefore, he was guilty of the death of an officer who was shot by another officer. 758 S.W.2d 264, 273 (Tex. Crim. App. 1988). In *Pettigrew v. State*, our sister court affirmed Pettigrew's murder conviction for the death of an innocent bystander shot by Pettigrew's rival. 999 S.W.2d 810, 813 (Tex. App.—Tyler 1999, no pet.). The court noted,

> [Pettigrew] voluntarily entered the parking lot. He and his brother initiated the gun battle with the Chapel Hill gang. By intentionally discharging a firearm toward a group of people, [Pettigrew] showed he was aware that someone could be killed or that serious bodily injury could result from his committing an act clearly dangerous to human life. . . . [T]here is no distinction between an innocent bystander being killed by return fire and a police officer being killed by friendly fire during a shootout initiated by outlaws.

*Id.*

As the prosecutors explained in this case during voir dire and emphasized during their closing argument,

> [W]hen you plan this and you storm in there and you cause this chaos and you're firing guns and you're beating people up, some of your own individuals are going to be hurt.
>
> . . . . You are responsible for anything that happens out there. And if those two men were dead, [Baker] would be charged with their murder as well. . . . [J]ust because they went in there on your side doesn't mean that you are any less responsible for their injuries. Because it was your plan. It was his plan. He called it.

Although the law recited above on causation was not included in the jury charge, it is part of the hypothetically correct jury charge in this case. *See Jenkins*, 493 S.W.3d at 599; *Longoria v. State*, 154 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *see also Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)

21

(noting that reviewing court must consider all of the evidence admitted for sufficiency purposes, even if that evidence was improperly admitted).

In addition to the evidence recited above, the jury heard the following evidence:

- Karadeema's phone contained a December 10, 2014 text stating, "Let's Fuck him up" and another one on that same date stating, "If we have a green light and catch him wearing it and recruiting . . . sure."

- When OMGs discuss going to "church," that means a meeting is going to take place in which the members discuss business and resolve issues.

- A text on Stover's phone discussed having "church" on December 11, 2014.

- Karadeema's phone contained a December 12, 2014 text from Rebel Rider Breadman asking the "Brothers" to "try to be at the club house between 6 and 6:30."

- Chad Connor, a Rebel Rider, described the Gator's battle as an ambush.

The evidence shows that the Bandidos would not have engaged in violence without Baker's approval and that the Bandidos started the violence at Gator's as a group, of which Baker was a member. A band member performing that night saw a Ghost Rider shoot at Bandidos fleeing the scene and "hear[d] a couple of them . . . hurting from something." Bandido members Dudley and Anderson were at Gator's that evening and were shot at or near Gator's. Another Bandido took Dudley to a hospital, and an ambulance picked Anderson up down the street from Gator's and took him to a different hospital. The police recovered Dudley's and Anderson's motorcycles across from Gator's. Additionally, FWPD Officer J.J. Jeanes spoke to

Dudley about what had happened, collected his clothes,[6] and obtained both men's medical records.

While there is no direct evidence that Baker shot anyone himself, the evidence shows that the Bandidos would not have started the battle at Gator's without Baker's approval and that his presence there signified his approval. Whether Dudley and Anderson were shot by friendly fire, *see* Tex. Penal Code Ann. § 7.02(b), or rival gang members, *see id.* § 6.04, the evidence sufficiently shows beyond a reasonable doubt that their injuries would not have occurred absent Baker's conduct. We therefore hold the evidence sufficient to support his convictions for engaging in organized criminal activity concerning the aggravated assaults of his fellow Bandidos Anderson and Dudley. *See Dowden*, 758 S.W.2d at 273; *Kennedy v. State*, No. 06-06-00002-CR, 2006 WL 2787477, at *3 (Tex. App.—Texarkana Sept. 29, 2006, no pet.) (mem. op., not designated for publication) (upholding defendant's conviction for aggravated assault of a public servant even though he did not break the jailer's leg because without the defendant's "resistance to and struggle against what the jury believed was lawful restraint, no officer would have tackled [him] and struggled in a pile-up in such a way as to result in [the jailer's] injury," and "[the defendant's] conduct caused the engagement, the effect of which resulted in [the jailer's] broken leg"); *Pettigrew*, 999 S.W.2d at 813. We overrule Baker's third and fourth points.

---

[6]A spent bullet was found in his back jeans pocket.

## D. Directing Activities of a Criminal Street Gang

In his fifth and sixth points, Baker challenges the sufficiency of the evidence supporting his convictions for directing the activities of a criminal street gang regarding Brady's murder and Antes's aggravated assault (Counts One and Three).

Section 71.023 of the Texas Penal Code provides in relevant part,

(a) A person commits an offense if the person, as part of the identifiable leadership of a criminal street gang, knowingly . . . directs[] or supervises the commission of . . . one or more of the following offenses by members of a criminal street gang:

(1) a felony offense that is listed in Article 42A.054(a) [former Section 3g(a)(1), Article 42.12], Code of Criminal Procedure; [or]

(2) a felony offense for which it is shown that a deadly weapon, as defined by Section 1.07, was used or exhibited during the commission of the offense . . . .

Tex. Penal Code Ann. § 71.023(a)(1)–(2). The Article 42A.054(a) list of predicate offenses includes murder but not aggravated assault, *see* Tex. Code Crim. Proc. Ann. art. 42A.054(a)(2). However, aggravated assault with a deadly weapon falls under Subsection (a)(2) of the directing statute, *see* Tex. Penal Code Ann. §§ 22.01, 22.02(a)(2). Thus, both murder and aggravated assault can be used as predicate offenses to support a conviction for directing the activities of a criminal street gang under Penal Code Section 71.023.

We have already held that the evidence is sufficient to support that Baker not only participated in the murder as a party, but that he participated in Brady's murder

and the aggravated assault of Antes as a member of a criminal street gang.[7] We also hold that the evidence is sufficient to show that Baker directed or supervised the murder and aggravated assault as part of the identifiable leadership of a criminal street gang.

Baker was the Fort Worth Bandidos chapter president at the time of the Gator's incident. As president, he was the "shot caller" and had absolute authority: nothing would have happened without his approval. His presence at the Gator's battle—including his presence in the room when Stover hit Antes and his presence in the group of men who beat, kicked, and shot Brady—demonstrates not only his foreknowledge and approval of the murder and aggravated assault but that he was directing or supervising them. The evidence of Baker's presidential role in the Bandidos, his absolute authority, the dissension among the gangs represented at Gator's because of the Texas bottom rocker, the coordinated attack by the Bandidos, and Brady's and Antes's obvious membership in rival gangs as shown by the Ghost Rider vest and colors Brady wore and the Wino's Crew vest and colors Antes wore all show that Baker was acting as part of the identifiable leadership of the Bandidos when he directed or supervised Brady's murder and Antes's aggravated assault. We therefore

---

[7]Baker relies on the same sufficiency argument as he has for the other offenses—that the eight eyewitnesses did not testify that he committed any act against Brady and that the evidence offered by law enforcement was no evidence. But the directing statute does not require the person directing the predicate offense to individually commit the act. *See* Tex. Penal Code Ann. § 71.023(a).

hold that the evidence is sufficient to support Baker's convictions for directing organized criminal activity, and we thus overrule his fifth and sixth points.

## II. Double Jeopardy

In his eighth point, Baker complains that his three convictions relating to the death of Brady—murder, directing the activities of a criminal street gang, and engaging in organized criminal activity—violate his right to be free from double jeopardy. In his ninth point, Baker complains that his two convictions relating to Antes's aggravated assault—directing the activities of a criminal street gang and engaging in organized criminal activity—also violate that right.

Baker did not raise a double-jeopardy complaint in the trial court. A defendant may forfeit a potential double-jeopardy violation by not asserting it in the trial court. *Langs v. State*, 183 S.W.3d 680, 686–87 (Tex. Crim. App. 2006). But he may raise a double-jeopardy claim for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of [the] usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). A double-jeopardy claim is apparent on the face of the trial record if resolving the claim does not require further proceedings to introduce additional evidence supporting the claim. *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013); *Gonzalez*, 8 S.W.3d at 643. While the State may have an interest in maintaining a conviction's finality, there is no legitimate interest in maintaining a conviction when the face of the record clearly

26

shows that the conviction was obtained in contravention of constitutional double-jeopardy protections. *Denton*, 399 S.W.3d at 545. We thus address Baker's double-jeopardy complaint and determine that the face of the record reveals no double jeopardy.

## A. Substantive Law

The Fifth Amendment protects against multiple punishments for the same offense. *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App.), *cert. denied*, 139 S. Ct. 646 (2018). To determine whether a defendant has been assessed multiple punishments for the same offense, we start with the "same elements" test set forth in *Blockburger*. *Id.* (referring to *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)). Under that test, two offenses are not the same if "each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182).

Using the cognate-pleadings approach, we look to the pleadings to flesh out the *Blockburger* test. *Id.* If the two offenses have the same elements under this approach, then there is a judicial presumption that the offenses are the same for purposes of a double-jeopardy analysis. *Id.* A "clearly expressed legislative intent to create two separate offenses" rebuts that presumption. *Id.*

Conversely, if the two offenses have different elements as pled, the judicial presumption is that the offenses are different for double-jeopardy purposes, and multiple punishments may be imposed. *Id.* at 184–85. This presumption too can be

rebutted by a showing, through various factors, that the legislature clearly intended only one punishment. *Id.* at 185.

The Texas Court of Criminal Appeals has set forth the following nonexclusive list of considerations to help determine legislative intent in this context: (1) whether the offenses are in the same statutory section; (2) whether the offenses are phrased in the alternative; (3) whether the offenses are named similarly; (4) whether the offenses have common punishment ranges; (5) whether the offenses have a common focus, including whether their gravamina are the same; (6) whether the common focus tends to indicate a single instance of conduct; (7) whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*; and (8) whether any legislative history articulates an intent to treat the offenses as the same for double-jeopardy purposes. *Bigon v. State*, 252 S.W.3d 360, 371 (Tex. Crim. App. 2008) (citing *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999)); *see also Garfias v. State*, 424 S.W.3d 54, 59 (Tex. Crim. App. 2014).

Baker argues that we should rely on "the doctrine of subsumed acts," called the "merger doctrine" in other jurisdictions, in our analysis. *See Aekins v. State*, 447 S.W.3d 270, 275 (Tex. Crim. App. 2014). However, unlike in sexual assaults in which criminal acts such as exposure or contact are necessarily committed on the way to "one complete, ultimate act of penile penetration" of a complainant's sexual organ, this is not a case where the offense was one "single continuous act" with only one impulse,

28

in which several offenses were committed along the continuum. *See id.* at 275, 278; *see also Hall v. State*, 225 S.W.3d 524, 532–33 (Tex. Crim. App. 2007) (distinguishing cognate-pleadings approach from cognate-evidence approach, which focuses on proof at trial). We will therefore rely on the *Blockburger* test and cognate-pleadings approach.

## B. Analysis[8]

The directing offenses require proof that the defendant supervised or directed others in committing the predicate offenses, but the engaging offenses require proof

---

[8]Although Baker asserts that his convictions for all three of the murder-related offenses violate double jeopardy, he provides only a one-paragraph analysis specific to his convictions for directing the activities of a criminal street gang and engaging in organized criminal activity as a member of a criminal street gang. Therefore, we will address only those two convictions in the double-jeopardy analysis for the murder-related convictions. *See, e.g.*, *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) ("[A]n appellate court is not required to make an appellant's arguments for" him.); *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Perez v. State*, 562 S.W.3d 676, 694 (Tex. App.—Fort Worth 2018, pet. ref'd), *cert. denied*, 140 S. Ct. 236 (2019).

But we note that the Texas Court of Criminal Appeals has held that trying and punishing a defendant in a single prosecution for engaging in organized criminal activity and for the underlying offense on which the engaging in organized criminal activity offense is based (the predicate offense) does not violate double jeopardy. *Garza v. State*, 213 S.W.3d 338, 348, 352 (Tex. Crim. App. 2007) (holding that the State's obtaining convictions and punishments for capital murder and engaging in organized criminal activity by committing capital murder did not violate double jeopardy because Texas Penal Code Section 71.03(3) "indicate[s] with sufficient clarity [the Texas Legislature's] intention that a defendant charged with engaging in organized criminal activity may also be charged (at least in the same proceeding) with the underlying offense and punished for both"); *see Garrett v. State*, No. 02-16-00121-CR, 2017 WL 3298260, at *2 (Tex. App.—Fort Worth Aug. 3, 2017, pet. ref'd) (per curiam) (mem. op., not designated for publication) (following *Garza* to hold that defendant's convictions and punishments for both murder and engaging in organized criminal activity by committing murder did not violate double jeopardy).

that the defendant participated in committing the predicate offenses. Tex. Penal Code Ann. §§ 71.02(a)(1), 71.023(a)(1). Therefore, each requires proof of an element that the other does not.

And the State pleaded these offenses this way. The same theories of murder by a criminal street gang—(1) intentionally or knowingly causing Brady's death by shooting him with a firearm and (2) intentionally, with the intent to cause Brady serious bodily injury, committing an act clearly dangerous to human life, shooting him with a firearm which caused his death—are alleged as the predicate offense in Count One (as part of the identifiable leadership of a criminal street gang, Baker directed or supervised the commission of Brady's murder by members of a criminal street gang) and Count Four (Baker committed murder as a member of a criminal street gang). *See id.* §§ 19.02(b)(1), (2), 71.02(a)(1), 71.023(a)(1). Likewise, the same theories of aggravated assault by members of a criminal street gang—intentionally or knowingly causing bodily injury to Antes by striking him with a fist, flashlight, or object unknown while using or exhibiting a deadly weapon (firearm or knife)—are alleged in Count Three (as part of the identifiable leadership of a criminal street gang, Baker directed or supervised the aggravated assault by members of a criminal street gang) and Count Six (Baker committed aggravated assault as a member of a criminal street gang).

Because, as pleaded,[9] the directing and engaging offenses are not the same under *Blockburger*, we judicially presume the directing and engaging offenses are different for double-jeopardy purposes and that multiple punishments are authorized. *See Bien*, 550 S.W.3d at 184. We next apply the *Ervin* factors to determine whether there is evidence of any clear legislative intent to allow only one punishment. *Id.* at 185.

No separate statutory section indicates that the legislature intended that multiple punishments could be assessed for directing and engaging such as it does for engaging and the underlying predicate offense. *See* Tex. Penal Code Ann. § 71.03(3). And the legislative history for the directing and engaging sections indicates that the legislature's concerns triggering the sections differed. While Section 71.023 was "specifically designed to address criminal gang leadership that directs felony gang activity but *often* avoids strict penalty by blaming the actions on other gang members," S. Comm. on Crim. Justice, Bill Analysis, Tex. S.B. 549, 83rd Leg., R.S. (2013) (emphasis added), proponents of the engaging statute

> argued that the statute was intended to make it less difficult for law enforcement officials and criminal justice agencies to obtain convictions for participation in organized crime and to enhance convictions in such areas as dope rings, or car theft rings, which may stretch across several

---

[9]Even though there could be overlap between the directing and engaging offenses based on the application of the law of parties in the charge and at trial, we do not consider it because the cognate-pleadings approach expressly excludes consideration of the trial evidence. *See Ex parte Watson*, 306 S.W.3d 259, 262 (Tex. Crim. App. 2009).

31

counties, and employ a number of persons operating in coordination with one another but may not know one another's identity,

*O'Brien v. State*, 544 S.W.3d 376, 390 n.56, 395 (Tex. Crim. App. 2018) (citing H. Study Grp., Bill Analysis, Tex. S.B. 151, 65th Leg., R.S. (1977)). We cannot say that the legislative history indicates a clear intent *not* to punish gang leadership for both offenses when the engaging offense is concerned with the participation in the concerted activity while the directing offense is concerned with the organization and direction of that coordinated activity.

Absent direct evidence of clear legislative intent, the gravamen or focus of a statute is the best indirect indicator of such intent. *See Garfias*, 424 S.W.3d at 59. Judge Cochran has indicated that the gravamen of engaging in organized criminal activity as a member of a criminal street gang[10] "is the additional harm and danger to the public of having the members of a criminal organization working together to commit crimes on an ongoing basis. That is why the punishment range for a conviction under the organized criminal activity statute is one degree higher than for the" predicate offense. *Ex parte Chaddock*, 369 S.W.3d 880, 889 (Tex. Crim. App. 2012) (Cochran, J., concurring) (footnote omitted). Applying Judge Cochran's words to Section 71.023,

---

[10]Although the Court of Criminal Appeals has held that the gravamen of engaging in organized criminal activity with the intent to establish, maintain, or participate in a combination "is a circumstance surrounding the conduct, namely the existence or creation of a combination that collaborates in carrying on criminal activities," it expressly declined to decide the gravamen for engaging in organized criminal activity as a member of a criminal street gang. *See O'Brien*, 544 S.W.3d at 384 n.23, 395.

the directing statute, its gravamen appears to be "the additional harm and danger to the public" from criminal street gang leaders directing or supervising the gang members in "commit[ting] crimes on an ongoing basis" and getting away with it. *See id.*; S. Comm. on Crim. Justice, Bill Analysis, Tex. S.B. 549, 83rd Leg., R.S. (2013).[11] The gravamina of the offenses therefore greatly overlap but are not the same. This factor weighs in favor of multiple punishments. *See Garfias*, 424 S.W.3d at 61.

Applying other *Ervin* factors, the statutes are not in the same section of the Penal Code but are separated only by two other sections in the same chapter. This fact slightly weighs in favor of treating the offenses as the same offense. *See Ex parte Benson*, 459 S.W.3d 67, 78 (Tex. Crim. App. 2015). Their names, *engaging in organized criminal activity* and *directing activities of criminal street gangs* are similar: *activity* and *activities*, *organized* and *gangs*, and *criminal* (both). This factor also slightly favors treating the offenses as the same. *See id.* at 79–80. The offense of directing activities of criminal street gangs has a set punishment range of twenty-five to ninety-nine years' or life imprisonment. Tex. Penal Code Ann. § 71.023(b). But the punishment range of engaging in organized criminal activity varies with the predicate offense. *See id.* § 71.02(b)–(d). This factor reinforces that with the engaging offense, the legislature was concerned more with the coordinated participation in the predicate offense, but with the directing offense, it was concerned more with the organization and concerted

---

[11]This conclusion comports with the legislative history described above.

direction of that activity. Thus, this factor weighs against treating the offenses the same. *See Benson*, 459 S.W.3d at 80.

Weighing all of the factors together, these mixed results do not rebut the presumption that the legislature intended to allow multiple punishments for these offenses.

We therefore overrule Baker's eighth and ninth points.

### III. Forfeited Error

In his tenth point, Baker complains of testimony to which he raised no objection at trial. Officer Doug Pearson testified that in the past, he had arrested motorcycle gang members in possession of illegal firearms. Officer Steve Groppi testified about arrests of Bandidos Blake Taylor, Tommy Jennings, and Clayton Reed after the gang shooting in Waco, Texas. Baker appears to rely on a written pretrial global objection he filed to the admission of extraneous offenses, his request for notice of the State's intent to use evidence of extraneous offenses at trial, and the absence of the testimony at issue from the State's notices of their intent to offer extraneous offenses. That is not enough to preserve error. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Further, the party must obtain an express or implicit adverse trial court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2);

34

*Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013). Because Baker did not complete these steps, he forfeited any error regarding the trial court's admitting the evidence challenged on appeal. We overrule his tenth point.

## CONCLUSION

Having overruled Baker's ten points, we affirm the trial court's judgments.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 9, 2020